**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 3 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

RICK D. BURNS,

      Plaintiff-Appellant,

v.

BOARD OF COUNTY
COMMISSIONERS OF JACKSON
COUNTY, KANSAS; EDWARD V.
BRUNS; JOHN T. GRAU; ELLEN
SCHIRMER,

      Defendants-Appellees.

No. 02-3121

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 00-CV-4119-SAC)**

---

Deanne Watts Hay (Stanley R. Parker with her on the briefs), Parker & Hay,
L.L.P., Topeka, Kansas for the Plaintiff-Appellant.

J. Steven Pigg, Fisher, Patterson, Sayler & Smith, L.L.P., Topeka, Kansas for the
Defendants-Appellees.

---

Before **LUCERO**, **BALDOCK** and **McCONNELL**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

      This civil rights appeal raises the following notable issue: whether

deposition corrections are subject to a "sham affidavit" analysis. We answer this question in the affirmative. As to the merits of plaintiff's constitutional challenge, arising from the termination of his employment with the Jackson County, Kansas Road and Bridge Department (the "Department"), we conclude that plaintiff has failed to show a genuine issue of material fact as to whether his termination was racially motivated in violation of the Equal Protection Clause of the Fourteenth Amendment, or intended to punish speech protected by the First Amendment. Thus, the district court properly granted summary judgment to the defendants. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I

Rick Burns, the plaintiff in the instant case, is one-quarter Native American and an enrolled member of the Pottawatomie Indian Tribe. From 1991 until January 28, 2000, Burns was employed by the Department, first as a truck driver and then as a road-grader operator. In November 1999, Burns's supervisor Ed Bruns wrote to the Department employees reminding them of the time they were required to be on the job and that travel time was not compensated. A month later, Burns and several other Department employees met with County Counselor Ed Dunn to discuss whether they would be covered by workers' compensation insurance for any accidents that occurred on the way to work. During this meeting, Burns allegedly made a remark about the County Commissioners to the

effect that "you can't teach the dumb son of a bitches anything." (1 Appellant's App. at 152.)

Following this meeting with Dunn, supervisor Ed Bruns implemented a new pay plan that divided employees into "A" and "B" categories, with the "A" category employees receiving higher pay. Some employees, including Burns, believed that Bruns had placed the employees who went to talk to Dunn in the "B" category because they were "troublemakers." (1 id. at 86.) Burns confronted Bruns about the new pay plan, but Bruns provided no explanation.

On January 24, 2000, County Commissioner John Grau came to Burns's house at Burns's request, to discuss certain concerns Burns had regarding the Department. In addition to the new pay plan, Burns was concerned about (1) why the Department had traded a bulldozer for a Caterpillar and (2) why the Department had traded a Ford pickup for a Chevy pickup. Burns considered it strange that the Department purchased the new Caterpillar without testing it first. Regarding the pickup trade, Burns considered it suspicious that the bridge foreman, who had often ridden in the old Ford pickup, purchased the Ford when the Department put it up for sale.

At his meeting with Grau, Burns began by discussing the equipment purchases. The conversation then turned to the new pay plan, and Burns asked Grau who was responsible for the decision. Grau responded "you can blame it on

me." Pressed further by Burns, Grau explained that "we all made it." (1 id. at 78.) By all accounts, Burns then became angry and called Grau a "lying motherfucker." (Appellant's Br. at 4; Appellees' Br. at 5.)

What happened next is disputed by the parties. Burns claims that Grau lunged at him, backing Burns up against Grau's truck, and Burns put up his hand "to keep him away." (1 Appellant's App. at 78.) Burns also alleges that Grau called him a "no good Indian." (1 id.) George Uhl, another employee who was present during the meeting between Grau and Burns, confirms Burns's account of the altercation. Grau gives a different account of events,[1] claiming that Burns was the aggressor and that Burns grabbed Grau in the neck and shoulder area. Grau denies calling Burns a "no good Indian." (1 id. at 181.) Both parties agree that the rest of the conversation was less heated and the two men parted in a seemingly amicable manner.

Following this altercation, Grau called supervisor Ed Bruns and reported what had happened, telling Bruns "that Rick had asked him to stop by and he'd stopped by and Rick got hot and cussed him and calling him names [sic] and grabbed him." (1 id. at 124.) Grau told Bruns what profane epithet Burns had

---

[1]  Because this case was decided at the summary judgment stage, we must presume that Burns's version of events is correct, but Grau's version is relevant inasmuch as supervisor Bruns relied on Grau's account in deciding to terminate Burns.

used, and explained that Burns had been the aggressor, grabbing Grau close to his neck and shoulder. Grau explained to Bruns that Burns was upset about the pay plan and the equipment purchases, and told Bruns that Uhl had been present and shared some of the same concerns. On January 28, Bruns met in person with Grau, bridge foreman Terry Mick, and County Counselor Dunn. Grau related the altercation in more detail, but said nothing about having called Burns a "no-good Indian." (1 id. at 131.)

After this meeting, supervisor Bruns decided to terminate Burns. On January 28, 2000, Burns received the following letter from Bruns:

> The actions that you were involved in with Jackson County Commissioner John Grau on January 24, 2000 near your home, were of such a serious nature as to result in the immediate termination of your employment with the Jackson County Road and Bridge Department.
> Such actions as reported to me would constitute gross misconduct, the threatening or committing of physical violence against the person of John Grau, and other violations of your employment.
> I want to advise you that you may have a hearing before the Board of County Commissioners concerning this termination of your employment. If you desire a hearing, please request one within ten (10) days upon the receipt of this letter by calling the Jackson County Clerk's office.

(1 id. at 117.) Supervisor Bruns never indicated that he was irritated by the fact that Burns or anyone else had complained about trading a pickup truck, the purchase of a bulldozer, or the pay plan.

Burns requested, and received, a post-termination hearing before the Jackson County Board of Commissioners ("Board"), held on February 14, 2000. Grau, the Chairman, turned the meeting over to Commissioner Ellen Schirmer because he had been involved in the incident, but Grau did not abstain from voting. Before voting, the Commissioners consulted the minutes from a previous meeting, at which the Board had delegated to the Department supervisor the power to hire and fire Department employees. After the minutes were reviewed, Commissioner Ogden "moved to not terminate Rick Burns," but the motion "died for the lack of a second." (2 id. at 372.) Commissioner Grau then "moved to terminate Rick Burns. Ellen Schirmer seconded and the motion carried 2/1. [Ogden] voted against the motion." (2 id.) Thus, Burns's termination was upheld by a two-to-one vote.[2]

After the Board declined to reinstate him, Burns filed suit under 42 U.S.C. §§ 1981 and 1983 against the Board, supervisor Bruns, and Commissioners Grau and Schirmer. In this suit, Burns claims that his discharge was in retaliation for his exercise of First Amendment rights and/or on account of his Native American heritage and therefore a violation of the Equal Protection Clause of the Fourteenth

---

[2] As discussed below, we conclude that, because supervisor Bruns had the authority to terminate Burns without approval from the Board, and exercised that authority, the issue before the Board at Burns's post-termination hearing was whether to reinstate Burns following his termination.

Amendment.[3]  Defendants moved for summary judgment, which was granted by the district court.  Burns now appeals the grant of summary judgment to the defendants.

## II

"We review the district court's grant of summary judgment *de novo*, applying the same legal standard used by the district court."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  Simms, 165 F.3d at 1326.  However,

> [a]lthough the movant must show the absence of a genuine issue of
> material fact, he or she need not negate the nonmovant's claim.
> Once the movant carries this burden, the nonmovant cannot rest upon
> his or her pleadings, but must bring forward specific facts showing a
> genuine issue for trial as to those dispositive matters for which he or
> she carries the burden of proof.  The mere existence of a scintilla of

---

[3]  Burns also claimed that his termination was a violation of due process, but the district court rejected this argument because Burns did not have a legally protected property interest in his employment.  Burns does not challenge this ruling on appeal.

evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is genuine; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant. If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law.

Id. (quotations and citations omitted). In First Amendment cases in particular, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Schalk v. Gallemore, 906 F.2d 491, 494 (10th Cir. 1990) (quotation omitted).

## III

We proceed to consider the merits of Burns's claim under § 1983. Burns raises two separate constitutional claims, which we now address. First, Burns asserts that he was terminated because of his Native American ethnicity, in violation of the Equal Protection Clause of the Fourteenth Amendment. The district court rejected this argument, concluding that Burns had failed to show intentional discrimination under the test articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973).

## A

In reaching the conclusion that Burns was not terminated because of his Native American ethnicity, the district court relied in part on an apparent

concession made by Burns during his deposition. At his deposition, Burns was questioned about the reasons for his termination, as follows:

> Q. Do you think you were terminated because you're part Native American?
> A. <u>No.</u>
> Q. Why do you think you were terminated?
> A. That's the question I never really ever get answered?
> Q. What's your own opinion, though? Why do you believe you were terminated? Do you think it was because you called Grau a lying motherfucker?
> A. <u>Yeah, I'd say so.</u>

(1 Appellant's App. at 106 (emphasis added).) In his deposition corrections filed pursuant to Federal Rule of Civil Procedure 30(e), Burns changed the answers underlined above to "No, I don't think that was the only reason," and "Yeah, I'd say that was part of it." (1 <u>id.</u> at 110.) The district court disregarded Burns's "attempt to rewrite portions of his deposition," citing <u>Franks v. Nimmo</u>, 796 F.2d 1230 (10th Cir. 1986), and other cases. (2 <u>id.</u> at 509.) <u>Franks</u> and the other cases cited by the district court deal with what are generally referred to as "sham affidavits."

"There is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." <u>Franks</u>, 796 F.2d at 1237; <u>see also</u> <u>Miller v. A.H. Robins Co.</u>, 766 F.2d 1102, 1104 (7th Cir. 1985) (holding that "[a]n inconsistent affidavit may preclude summary judgment . . . if the affiant

was confused at the deposition and the affidavit explains those aspects of the deposition testimony"); 10B Charles Alan Wright et al., Federal Practice & Procedure § 2738, at 334 ("[A] witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier or later deposition."). We will disregard a contrary affidavit, however, when it "constitutes an attempt to create a sham fact issue." Franks, 796 F.2d at 1237. Factors to be considered in determining whether an affidavit presents a sham issue include "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." Id.

Burns argues that Franks and other cases dealing with "sham affidavits" are not relevant to the instant case, because he modified his statements not in a subsequent affidavit, but in an errata sheet submitted pursuant to Federal Rule of Civil Procedure 30(e). We reject this distinction. In the recent case of Garcia v. Pueblo Country Club, 299 F.3d 1233 (10th Cir. 2002), this court discussed the purpose of Rule 30(e). Quoting Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992), we noted that "[t]he Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.

Depositions differ from interrogatories in that regard. A deposition is not a take home examination." Garcia, 299 F.3d at 1242 n.5 (quotation omitted). We stated that "[w]e do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony." Id.

We see no reason to treat Rule 30(e) corrections differently than affidavits, and we hold that Burns's attempt to amend his deposition testimony must be evaluated under Franks. None of the three Franks factors is satisfied in the instant case. First, Burns was cross-examined at his deposition. Second, Burns's corrections were not based on any newly discovered evidence. Third, although Burns asserts that he was confused at his deposition, his answers to the direct questions posed by counsel do not reflect any obvious confusion—as opposed to indecisiveness or inconsistency—that the corrections would need to clarify. Thus, the district court correctly disregarded Burns's testimony. See Franks, 796 F.2d at 1237.

Disregarding Burns's deposition corrections, however, does not automatically lead to the conclusion that he conceded his case in the uncorrected answers. Earlier in his deposition, Burns was asked if he told Commissioner Ogden why he was terminated:

Q. Did you tell [Ogden] why you were terminated?

A. I don't really know why I was terminated.

Q. The letter tells you that you were terminated for your conduct on the – in the meeting with Mr. Grau on the 24th, doesn't it?

A. Yeah, but that, <u>that ain't what happened</u>.

(1 Appellant's App. at 82 (emphasis added).) At this point, Burns testified that his actions at the meeting with Grau were not the cause for his termination.[4] Burns's testimony at his deposition was internally inconsistent, and, given the summary judgment posture of this case, we must view the evidence in the light most favorable to Burns. See <u>Simms</u>, 165 F.3d at 1326. Thus, we hold that Burns did not concede his case at his deposition, and we now evaluate whether Burns has raised a genuine issue of material fact as to the alleged racial motivation for his termination.

**B**

"A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination."

---

[4] It might be argued that Burns's statement that "that ain't what happened" refers solely to his alleged assault on Grau, and not to the "lying motherfucker" comment. Under this view, Burns did not retract his statement that he was fired for using a profane epithet. Because we must view the evidence in the light most favorable to Burns, however, we conclude that Burns testified that his entire altercation with Grau, including the profane epithet, was not the cause of his termination.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000). Burns argued before the district court that Grau's alleged statement that he was a "no good Indian," together with two remarks about Indians allegedly made by Schirmer, constituted direct evidence of discrimination. The district court rejected this argument, and Burns does not challenge this ruling on appeal.

A plaintiff who lacks direct evidence of discrimination may show discrimination through indirect evidence by relying on the framework articulated by the Supreme Court in McDonnell Douglas, 411 U.S. at 802–04. While McDonnell Douglas involved a Title VII claim, its burden-shifting analysis applies equally to § 1983 claims of race discrimination in violation of the Equal Protection Clause. English v. Colo. Dep't of Corr., 248 F.3d 1002, 1007 (10th Cir. 2001).

"In order to survive summary judgment, a plaintiff relying on McDonnell Douglas bears an initial burden of establishing a prima facie case intended to eliminate the most common nondiscriminatory reasons that might account for the adverse employment action." Id. at 1008. If a prima facie case is made, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for terminating the plaintiff. Id. "If the defendant successfully meets its burden of production, the burden shifts back to the plaintiff to put forth evidence sufficient to allow a jury to find that the defendant's reason

is pretextual, *e.g.,* that it is unworthy of belief." Id. This "requires a showing that the tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason." McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) (quotation omitted).

Defendants do not dispute that Burns has made a prima facie case, and the burden accordingly shifts to defendants to articulate a legitimate, nondiscriminatory reason for the discharge. Defendants point to testimony by supervisor Bruns that he fired Burns for his altercation with Grau, as well as the termination letter citing Burns's alleged threats of violence or actual violence against Grau as a reason for his termination. This is a legitimate, nondiscriminatory reason for discharge. Thus, the question is whether the proffered reason is pretextual. As evidence of pretext, Burns points to anti-Indian comments allegedly made by Commissioner Schirmer as well as the "no good Indian" comment allegedly made by Commissioner Grau.

Burns cites two comments attributed to Commissioner Schirmer as supporting his contention that he was terminated on account of his race. First, Burns testified at his deposition that someone had told him that Schirmer had said "[s]omething about the damn Indians or something." (1 Appellant's App. at 105.) Burns did not know who had actually overheard this alleged comment; in any

case, it is hearsay and the district court correctly disregarded it.[5]  Second, Burns

points to another comment attributed to Schirmer by Commissioner Ogden, that

"there is [sic] two Native Americans running in the third district, so the third

district must not really care."  (2 id. at 462.)  This statement is more troubling.

Schirmer made this comment in the context of explaining to Ogden why she

thought it was inappropriate for him to serve both on the tribal council and on the

Board, due to a conflict of interest.  Based on this context, the district court

determined that Schirmer's comment "cannot reasonably be construed to be

racially derogatory."  (2 id. at 505.)  We disagree.  Because this case comes to us

at the summary judgment stage, we are required to view the evidence and draw

reasonable inferences therefrom in the light most favorable to Burns.  Simms, 165

F.3d at 1326.  Commissioner Ogden, a member of the Pottawatomie tribe,

testified that he was "upset" by Schirmer's comment, and noted that "we are kind

of in a turmoil of . . . I don't want to say prejudice but I guess it is."  (2

Appellant's App. at 462.)  Thus, Ogden apparently took Schirmer's comment to

---

[5]  If Burns himself had heard Schirmer make this comment, it might be admissible as an admission by a party opponent. Fed. R. Evid. 801(d)(2). However, the comment was reported to Burns by a third party, Jim Batiste, who may or may not have heard it himself. Hearsay within hearsay is admissible only "if each part of the combined statements conforms with an exception to the hearsay rule." Fed. R. Evid. 805. Burns identifies no exception to the hearsay rule that would apply to Batiste's out-of-court statement.

reflect bias or prejudice against Native Americans, and we must infer that Schirmer's comment did reflect such bias.

Assuming that Schirmer made a prejudicial remark about Native Americans to Ogden, however, does not show that her stated reasons for voting to uphold Burns's termination were pretextual. A plaintiff who relies on circumstantial evidence of racial animus to show pretext must "show some nexus between [the] circumstantial evidence and [the] decision to terminate him." English v. Colo. Dep't of Corr., 248 F.3d 1002, 1010 (10th Cir. 2001). In the instant case, Schirmer's comments were not directed specifically at Burns, and there is no other evidence that her decision not to reinstate Burns was motivated by racial animus. As discussed below, Schirmer testified that she voted to uphold Burns's termination because of his offensive language and alleged intimidation of Commissioner Grau. Burns has not shown that Schirmer's explanation for why she voted against reinstating Burns was "a disingenuous or sham reason." McKnight, 149 F.3d at 1129 (quotation omitted).

This leaves the "no good Indian" comment allegedly made by Grau. Grau's comment clearly reflects racial animus, and, because it was directed at Burns, there is arguably a nexus between the comment and Grau's vote to uphold Burns's termination. Nonetheless, Burns has not shown that the outcome of the hearing would have been different had Grau recused from voting. While Burns alleges

that a one-to-one vote (with Schirmer voting for termination and Ogden voting against) would have resulted in his reinstatement, he points to no evidence in the record that this was the rule followed by the Board. At a previous meeting, the Board had delegated to supervisor Bruns the right to hire and fire Department employees.[6] To avoid rendering Bruns's delegated authority meaningless, the only reasonable inference must be that, short of a majority vote to reinstate Burns, Bruns's decision would stand. It would be unreasonable to infer that, given Bruns's delegated authority, a tie vote would suffice to overturn his decision. Moreover, Commissioner Schirmer testified at her deposition that "if it was one and one, I believe the decision would stand." (1 Appellant's App. at 208.) Burns introduced no evidence to refute Schirmer's testimony. Thus, we conclude that the issue before the Board was whether to reinstate Burns, and a tie vote would not have changed the outcome.

In short, Burns has failed to raise a genuine issue of material fact as to whether he was terminated on account of his Native American ethnicity. Burns has failed to show that Bruns terminated him on account of his race or that

---

[6] As discussed above, at the post-termination hearing, the Board consulted the minutes from a previous meeting held February 15, 1999, when the Board by a two-to-one decision "gave the Road and Bridge Supervisor the right to hire and fire Road & Bridge employees." (2 Appellant's App. at 372.) Commissioner Grau later confirmed at his deposition that supervisor Bruns had the authority to fire Department employees without the approval of the Board.

- 17 -

Schirmer's stated reasons for upholding the termination were pretextual. Even if we assume that Grau's vote was motivated by racial animus, Burns has not brought forward any evidence that the outcome would have been different had Grau abstained from voting. We hold that the district court did not err in granting summary judgment to the defendants on Burns's Equal Protection claim.

**IV**

Burns's alternative argument is that he was terminated in retaliation for exercising his First Amendment rights. According to Burns, he was terminated not for using a profane epithet and allegedly assaulting Grau, but for his comments about possible favoritism in the Department (the new pay scale) and possible impropriety regarding equipment purchases. A government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Lytle v. City of Haysville, 138 F.3d 857, 863 (10th Cir. 1998) (quoting Connick v. Myers, 461 U.S. 138, 142 (1983)). "Fighting words," however, are not protected by the First Amendment. NAACP v. Claiborne Hardware Co., 458 U.S. 886, 927 (1982). We define "fighting words" as "epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas." Cannon v. City & County of Denver, 998 F.2d 867, 873 (10th Cir. 1993). Burns's profane epithet directed at Grau is a clear example of

"fighting words" not entitled to First Amendment protection. During his meeting with Grau, however, Burns also complained about equipment purchases and the new pay plan. Burns's speech about these topics may be protected by the First Amendment.

**A**

In analyzing whether a public employer's actions impermissibly infringe on free speech rights, we apply the four-prong test articulated in <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968).[7] We first decide "whether the speech at issue touches on a matter of public concern." <u>Schalk</u>, 906 F.2d at 494 (citing <u>Connick</u>, 461 U.S. at 146). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." <u>Connick</u>, 461 U.S. at 147–48. In determining whether the speech touches on a matter of public concern, we look to

---

[7] The first three steps of the <u>Pickering</u> test are (1) whether the speech touches on a matter of public concern, (2) whether the employee's interest in commenting on matters of public concern outweighs the interest of the state in promoting the efficiency of the public service it performs through its employees, and (3) whether the protected speech was a substantial or motivating factor behind the adverse employment decision. <u>See</u> <u>Gardetto v. Mason</u>, 100 F.3d 803, 811 (10th Cir. 1996) (citing <u>Pickering</u> and its progeny). If these three factors are met, (4) the burden shifts to the employer to establish that it would have reached the same decision in the absence of the protected conduct. <u>Id.</u> In the instant case, the district court concluded that factors (1) and (3) are not met, and did not reach factors (2) or (4). Because, as discussed below, we agree with the district court as to factor (3), we also do not reach factors (2) and (4).

whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community." Id. at 146. It is not sufficient that the topic of the speech be of general interest to the public; "in addition, what is *actually said* must meet the public concern threshold." Schalk, 906 F.2d at 495. Moreover, under our precedent, the speech must "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of the government." Lee v. Nicholl, 197 F.3d 1291, 1295 (10th Cir. 1999) (quotation omitted). It is not necessary, however, for speech to be made publicly in order to qualify for First Amendment protection. Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415–16 (1979).

Finding Burns's thoughts on the equipment purchases and the pay plan insufficiently informative to be useful to the public, the district court held that Burns's speech did not touch on a matter of public concern. We agree with this conclusion as to Burns's comments on the purchase of the Caterpillar,[8] but we part company with the district court as to Burns's comments on the pickup trade

---

[8] Burns had two concerns about the equipment purchases: (1) that the Department bought a new Caterpillar without first trying it out, and (2) that the pickup trade was improper. As to the Caterpillar, Burns offers no basis for his suspicion that there was anything improper about that purchase. Burns's speech about the Caterpillar purchase could not "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of the government." Lee, 197 F.3d at 1295 (quotation omitted). Thus, we conclude that Burns's speech on the Caterpillar purchase did not touch on a matter of public concern.

and the pay plan. Burns had a legitimate reason for suspecting that there was some impropriety in the pickup trade: the bridge foreman, who often rode in the Ford pickup, was willing to purchase it despite the fact that the Department's stated reason for selling it was that it was too "beat" and "wore out" to serve its purpose. (1 Appellant's App. at 77.) As to the pay plan, Supervisor Bruns had discretion to decide how each employee should be classified, and he made this decision based on performance evaluations, not seniority. Burns knew that employees were being classified differently under the new plan, and he was personally aware of the plan's impact on Department morale. Moreover, Burns's suspicion that employees who met with County Counselor Dunn were punitively classified as "B" employees was shared by Commissioner Ogden.

Viewing the facts in the light most favorable to Burns, we conclude that Burns was justifiably concerned about the pickup trade and the pay plan. "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import." Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988). Thus, we hold that Burns's speech regarding the pickup trade and the pay plan touched on a matter of public concern.

**B**

As an alternative basis for granting summary judgment to the defendants on

Burns's First Amendment claim, the district court held that the third Pickering factor, that the plaintiff's protected speech "was a substantial or motivating factor in the termination," Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668, 675 (1996), was not met. As the district court noted, George Uhl, another Department employee, had spoken out publicly against Department policies,[9] but Uhl was not terminated. This suggests that Burns was not terminated because of his speech on similar topics.

Burns does not contest the district court's finding that Uhl was not terminated for speaking out on the same topics as Burns. Instead, Burns argues that it is irrelevant whether other employees were not fired for speaking out against the equipment purchases or the pay plan, because those other employees were not Native Americans. By making this argument, however, Burns conflates his First Amendment claim with his Equal Protection claim. As discussed above, we conclude that Burns has failed to show that his termination was a result of racial animus.

At oral argument, Burns's counsel directed us to Schirmer's deposition testimony as support for Burns's First Amendment claim. Burns contends that Schirmer concedes in her deposition that she upheld Burns's termination because

---

[9] Uhl wrote a letter to a local newspaper about "purchases they make with the County," and attended "Commission meetings" at which he raised concerns about Department pay scales and insurance policies. (1 Appellant's App. at 220.)

he criticized Commissioner Grau. Having reviewed this testimony, however, we conclude that it raises no genuine issue of material fact as to whether Burns was terminated for his speech. Schirmer did state that, in her view, Bruns "had the power to fire [Burns]" because Burns "was disrespectful and intimidating to a commissioner and I thought that was inappropriate." (1 Appellant's App. at 205.) When asked whether it was appropriate to terminate Burns "because he talked to John Grau individually rather than at a commission meeting," however, Schirmer responded, "Not that he talked to him. Intimidation is another thing." (1 id.) Schirmer was then asked whether Burns forfeited his "right to talk to elected officials about his concerns" because he was a County employee, and she responded, "I think if he doesn't use appropriate language, that's my feeling." (1 id.) This testimony shows that Schirmer voted to terminate Burns not for his protected speech, but for his alleged intimidation of Grau and the inappropriate language he used.

Burns was not fired for speaking out against the new pay plan or the equipment purchases. He was fired for hurling a profane epithet at a County Commissioner and allegedly using physical force against him. Whether Burns actually used such force is irrelevant, for Bruns and Schirmer thought that he did, and it is their reason for firing him that matters. We conclude that there is no evidence that Burns's protected speech was a "substantial or motivating factor" in

his termination.  Umbehr, 518 U.S. at 675.  The district court committed no error in granting summary judgment to the defendants on Burns's First Amendment claim.

## V

The judgment of the district court is **AFFIRMED**.[10]

---

[10]  In his complaint, Burns claimed that the actions of the defendants violated both 42 U.S.C. § 1981 and § 1983.  In response, defendants argued that § 1983 provides the exclusive remedy in these circumstances, precluding a direct action under § 1981.  The district court agreed and granted summary judgment to the defendants on Burns's § 1981 claim.

There is a circuit split as to whether the 1991 amendments to § 1981 overruled Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989), in which the Supreme Court held that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units."  Compare Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1214 (9th Cir. 1996) (holding that § 1981, as amended in 1991, "contains an implied cause of action against state actors, thereby overturning Jett's holding that 42 U.S.C. § 1983 provides the exclusive federal remedy against state actors for the violation of rights under 42 U.S.C. § 1981"), with Oden v. Oktibbeha County, 246 F.3d 458, 462–64 (5th Cir. 2001) (concluding that Jett was not overruled by the 1991 amendments), Butts v. County of Volusia, 222 F.3d 891, 894 (11th Cir. 2000) (same), and Dennis v. County of Fairfax, 55 F.3d 151, 156 n.1 (4th Cir. 1995) (same).  We need not reach this question in the instant case.  Because Burns has failed to show that his constitutional rights were violated, he has no claim under either § 1981 or § 1983, and thus it is immaterial whether a direct cause of action lies under the former.