Edwin **REYNOLDS**, Plaintiff,

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION,** Defendant.

**No. 3:02–CV–950–J–32HTS.**

United States District Court, M.D. Florida. Jacksonville Division.

May 26, 2004.

---

Scott Thomas Fortune, Esq., Kimberly A. Gossett, Esq., Fortune & Gossett, P.A., Jacksonville Beach, FL, for plaintiff.

Mark G. Alexander, Esq., Guy O. Farmer II, Esq., Holland & Knight LLP, Jacksonville, FL, for defendant.

## ORDER

CORRIGAN, District Judge.

This case is before the Court on International Business Machines Corporation's ("IBM") Motion for Summary Judgment. (Doc. 47). Edwin Reynolds filed a response, (Doc. 64), and IBM filed a reply. (Doc. 83). The Court heard oral argument on the motion on April 2, 2004. (Doc. 82).

### I. Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any that establish the absence of any genuine material, factual dispute." *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1252–53 (11th Cir. 2003) (internal quotations omitted). "The evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

## II. Factual Background

During April of 1999, plaintiff Edwin Reynolds interviewed for a Band 10 Contract Negotiation Executive position with IBM. (Reynolds Dep., Ex. 3).[1] Barbara Doyle, a Professional Development Manager ("PDM") for IBM who interviewed Mr. Reynolds for the Contract Negotiation Executive position, testified that Mr. Reynolds demonstrated his negotiation skill, which was "the biggest part of the job he needed to do." (Doyle Dep. at 20–21).[2] Additionally, Ms. Doyle testified that she believed that Mr. Reynolds' prior experience was in line with the requirements of the Band 10 Contract Negotiation Executive position, and recommended that IBM hire Mr. Reynolds.[3] (Id. at pp. 24–25). Mr. Reynolds began his employment with IBM in mid-May of 1999. (Reynolds Dep. at 103).

Mr. Reynolds was involved with two projects in 1999: Ace and the University of Michigan Health Services Network. On the Ace deal, Mr. Reynolds' only task was to observe. (Id. at 108–09). Stephen Moss, the team leader on the Ace project, testified that Mr. Reynolds did not appear comfortable with the amount of document creation involved in the position, and that Mr. Reynolds was not comfortable with strategy in the information technology area. (Moss Dep. at 76–78).[4] After observing the Ace contract negotiation, Mr. Reynolds was the lead negotiator on the University of Michigan Health Services Network project. (Reynolds Dep. at 114).[5] Mr. Reynolds' involvement was at the initial phase of this project,[6] which was worth, in Mr. Reynolds' estimation, approximately $100 million to IBM. (Id. at 115–16).[7]

On Mr. Reynolds' 1999 Personal Business Commitments evaluation ("PBC"), Mr. Reynolds received a "3"; which indicates that he "[a]chieved some/most commitments." (Reynolds 1999 PBC at 5).[8] There are two levels of performance above a "3": a "2", which indicates the employee "[a]chieved/exceeded commitments," and a "1", which is "extraordinary." (Id.). Additionally, an employee could also receive a "4," which is "[u]nsatisfactory performance." (Id.). Lester Thompson, a Contract Negotiation Executive at the Band 9 level, testified about a rating of "3":

> It's not a category that you want to be in. It affects your compensation and it

---

1. Mr. Reynolds' deposition is document 58 in the Court file and is cited herein as "Reynolds Dep. at ____."

2. Barbara Doyle's deposition is exhibit 20 to document 65 in the Court file and is cited herein as "Doyle Dep. at ____."

3. Ms. Doyle also testified that the expectations of the position were "that he would be able to negotiate a deal of considerable size pretty much on his own. And having, ... a good enough understanding of IBM, and all of its intricacies, and all of its towers, and all of its ... parts of a contract, so that he could articulate." (Id. at 24).

4. Mr. Moss' deposition is document 56 in the Court file and is cited herein as "Moss Dep. at ____."

5. Mr. Reynolds testified that, to the best of his recollection, this project probably spanned from November of 1999 to January of 2000. (Id. at 130).

6. Lois Wagner, who worked on the University of Michigan project, recalled that Mr. Reynolds' involvement was at the "Phase Zero" stage. (Wagner Dep., Doc. 61 at 16). Ms. Wagner also valued the entire contract at around $23 million in revenue to IBM. (Id.).

7. Mr. Reynolds was also the lead negotiator on a deal with Henry Ford Hospital, which he characterized as a smaller scale deal. (Id. at 124–25). The negotiations, however, did not lead to a contract. (Id. at 127).

8. Mr. Reynolds' 1999 PBC is exhibit 6 to Mr. Reynolds' deposition and is cited as "Reynolds 1999 PBC at ____" throughout this Order.

may affect your future assignments, so it's not a category you want to stay in for any consistent period of time, so although it may say satisfactory, it's satisfactory at times.

(Thompson Dep. at 83).[9]  Additionally, Linda Pierce, a PDM with IBM, testified that a "3" was the minimum level of satisfactory performance.  (Pierce Dep. at 175).[10]  Ms. Pierce also testified, however, that a "3" was a satisfactory rating for a new hire.  (*Id.* at 174).

Mr. Reynolds' 1999 PBC also contained an "Overall Assessment."  (Reynolds 1999 PBC at 6).  This overall assessment, which was completed by Carol Humphreys, stated:

> Ed joined IBM in Mid May and has been focusing on learning the IBM contracting processes and procedures.  He brings to IBM extensive Healthcare industry knowledge and experience and should continue to look for ways to transfer his industry expertise to the teams he works with on healthcare related engagements.  Ed also has extensive international experience particularly in Latin American [sic] and hopefully he will be given an opportunity to share this experience with the global deal teams.  Ed has had limited exposure to major engagements but has been able to demonstrate his knowledge about contracting (from his previous experience).  He needs to focus at this point on continuing to learn the basics about IBM processes, procedures and tools so that he can be comfortable with the basic tools, thus freeing him to focus on a strong leadership role in future deals that he will be assigned to work on in

2000.  He should focus on developing his outsourcing and technology skills including E-business.

(*Id.*).

Included in Mr. Reynolds' 1999 PBC was a New Hire Assessment which was also completed by Carol Humphreys, who was Mr. Reynolds' PDM when he started at IBM. (*Id.* at 5).  The New Hire Assessment requires a PDM to answer two questions: whether the employee's "[b]ehaviors demonstrated met or exceeded expectations" and whether the "[s]kills demonstrated met or exceeded expectations." (*Id.*).  On Mr. Reynolds' first New Hire Assessment, dated December 31, 1999, Carol Humphreys answered both questions in the affirmative. (*Id.*).  An IBM created document that explains the New Hire Assessment aspect of the PBC states that "IBM wants to hire and retain employees who are able to meet and exceed performance objectives, demonstrate those skills that were expected when hired, continue to grow skills valued by IBM and the customer, and demonstrate behaviors that reflect their ability to function effectively and productively in the IBM environment." (Humphreys Dep., Ex. 3, 69–70).[11]

Contemporaneous with the 1999 PBC, Mr. Reynolds completed an Individual Development Plan ("IDP"). (Reynolds Dep., Ex. 19).  This document required Mr. Reynolds to list skills that he needed to develop that related to his job as a Band 10 Contract Negotiation Executive.  (*Id.*).  The first entry under the "Skills Needed" heading states "[f]acility with computer and document processing tools, my problem is often basic lack of experience and

---

**9.**  Lester Thompson's deposition is document 60 in the Court file and is cited herein as "Thompson Dep. at ___."

**10.**  Linda Pierce's deposition is document 57 in the Court file and is cited herein as "Pierce Dep. at ___."

**11.**  Carol Humphreys' deposition is document 53 in the Court file and is cited herein as "Humphreys Dep. at ___."

skills in word processing skills." (Id.). Next to this entry Mr. Reynolds indicated that his current skill level was a "2," which is defined as "[v]ery limited experience" and "[l]imited ability to perform." (Id.). Mr. Reynolds also indicated that he would like to increase his performance level to a "4" by January 30, 2000. (Id.). Level "4" means "[r]epeated and successful experience ... [c]an perform without assistance and direct others in performing." (Id.). Mr. Reynolds also provided under the "Skills Needed" section of his IDP "Increase knowledge of IBM offerings and solutions in the Information Technology area. An overall increase in the [sic] my knowledge level as it relates specifically to the Information Technology Industry." (Id.). Mr. Reynolds rated his current skill level in this area as a "1", which is defined as "[n]o experience ... limited knowledge." (Id.). His goal was to get this skill to level "3" or "4" by May 17, 2000.[12] (Id.).[13]

Mr. Reynolds was diagnosed with osteoarthritis in both of his knees during the year 2000, which required him to use a cane to assist his mobility. (Reynolds Aff. at ¶ 26). Mr. Reynolds also could not, during 2000 and 2001, kneel without extreme pain, walk more than 50 to 100 yards without stopping to relieve pain and swelling, or stand for more than ten to fifteen minutes. (Id. at ¶ 29). In March of 2003, Mr. Reynolds had a joint replacement performed on his left knee, and his doctor has informed him that he will probably require the same procedure on the right knee at some point in the future. (Id. at ¶ 6).

During the year 2000, Mr. Reynolds was assigned to a deal IBM was negotiating with Aventis. Sheila Donohue was the first chair on the deal, and Mr. Reynolds was to serve as the second chair. (Donohue Dep. at 129–130).[14] During this deal, Ms. Donohue had to call in another second chair, Louis Levi. (Id. at 130). Ms. Donohue testified that the reason she needed to add an additional second chair was:

... in the situation with this particular customer and this particular law firm that was representing this customer, I needed someone that had some more experience, just to take the burden and pressure off me, someone that I knew. I knew that he didn't know how to, you know, to do documents and things like that. And so I needed somebody—or Ed didn't have a technical background, and so I needed somebody that had some more technical experience, and that's why I got Louis.

(Id. at 135–36). Ms. Donohue instructed Mr. Reynolds to observe certain aspects of the deal and to take notes as a learning experience. (Id.).[15]

Mr. Reynolds testified at his deposition that Ms. Donohue gave him feedback during the course of the Aventis deal. (Reynolds Dep. at 137). According to Mr. Reynolds, her feedback was both positive and negative. (Id.). The positive feedback involved Mr. Reynolds' knowledge of the pharmaceutical industry, while the nega-

---

**12.** Level "3" indicates "Some experience. Can perform with assistance. Performs independently in routine situations." (Id.).

**13.** Mr. Reynolds also indicated that he needed to gain "[a] more thorough understanding of the IBM contracts and negotiations process, [d]ocuments, strategies, relationship development and the over all [sic] job responsibilities." (Id.).

**14.** Sheila Donohue's deposition is document 52 in the Court file and is cited herein as "Donohue Dep. at ___."

**15.** Mr. Reynolds also produced some "minor schedules" in the contract. (Levi Dep., Doc. 55 at 36).

tive feedback involved Mr. Reynolds' document preparation skills. (*Id.*).[16]

Mr. Reynolds received his 2000 PBC in mid-January of 2001.[17] Mr. Reynolds received the same score, a "3", that he received on his 1999 PBC. (Reynolds 2000 PBC at 5). In the "Overall Assessment" area, Linda Pierce, Mr. Reynolds' PDM, wrote:

Ed worked on several deals this year ... the majority of them being in the health industry. Since Ed's past experience (prior to joining IBM) is in this field, this has been a good use of his industry knowledge. He worked with the team that closed the University of Michigan engagement. Even though this was a small deal in terms of current revenue for the Phase 1 of the project, the long term potential could be significant. Ed provided second chair support to Sheila Donohue on the Aventis engagement. The teams' hard work on this deal resulted in a signed ten-year contract worth more than $1B in services for IBM.

This engagement was a good opportunity for Ed to see the various components of a strategic outsourcing deal. He needs to continue to grow his knowledge of our offerings, products and legal positions. This is critical to Ed's ability to lead future engagements and close good business for IBM.

As a band 10, Ed has met some of his PBC commitments for 2000. He will continue to focus on growing his knowledge base and developing the skills he needs to be successful at this level. (*Id.*).[18]

Mr. Reynolds was then assigned to a negotiation with Air Canada during the early part of 2001, where he served as second chair to Tom Kramer. (Reynolds Dep. at 143–44). Mr. Kramer was also a Band 10 Contract Negotiation Executive. (Kramer Dep. at 11).[19] Mr. Kramer testified that during the Air Canada deal Mr. Reynolds could not complete the duties of a second chair in a satisfactory manner. (*Id.* at 58–64). According to Mr. Kramer, Mr. Reynolds could not manage documents, did not have any PC skills, and did not have an understanding of the complexities of the deal. (*Id.*).[20] Mr. Kramer worked on the Air Canada deal with Mr. Reynolds for "maybe a couple of weeks" before he decided to ask Linda Pierce for another second chair. (*Id.* at 61–62). Linda Pierce brought in Frank Smiraglia and, according to Mr. Kramer, "literally within one day we went from a situation that wasn't working to a situation that was working." (*Id.* at 62–63).[21]

---

**16.** Louis Levi also testified that Mr. Reynolds' lack of computer skills impacted his performance in the sense that it was slower. (Levi Dep. at 44).

**17.** Mr. Reynolds' 2000 PBC appears at several different places in the record, including as an exhibit to Mr. Reynolds' deposition. (Reynolds Dep., Ex. 7). When cited herein it will be denoted as "Reynolds 2000 PBC at ___."

**18.** There should have also been a New Hire Assessment form with Mr. Reynolds' 2000 PBC. Carol Humphreys testified that she could not think of a valid reason for why the New Hire Assessment was not attached. (Humphreys Dep. at 69). Ms. Humphreys also testified that she expected that the miss-

ing form would show identical results to the New Hire Assessment form attached to the 1999 PBC, namely that Mr. Reynolds' skills met or exceeded IBM's expectations. (*Id.*).

**19.** Tom Kramer's deposition is document 54 in the Court file and is cited herein as "Kramer Dep. at ___."

**20.** Mr. Reynolds testified that he had trouble with pulling together documents and document preparation during the Air Canada negotiation. (Reynolds Dep. at 149).

**21.** Mr. Kramer no longer worked for IBM at the time of his deposition. (*Id.* at 10). He is currently employed by Hewlett Packard. (*Id.*).

On February 27, 2001, Mr. Reynolds transmitted an email to his PDM, Linda Pierce, requesting information about IBM's procedure for taking medical leave. (Pierce Dep., Ex. 3). The text of the email stated:

> Linda as you know I have been having difficulty with my right knee for over a year. It is obvious that I will need to take some sort of corrective action[.] I will be meeting with an Orthopedic surgeon from the Mayo Clinic on Mon. 3/5/01 to discuss the appropriate course of action. I do not yet know what it is that will be recommended.
>
> It may however involve some time in rehabilitation. Does IBM have a proper method of applying for a medical leave? If so how would I do that?
>
> Thanks,
>
> Ed Reynolds

(*Id.*). Mr. Reynolds testified that Ms. Pierce never responded to his request for information about applying for medical leave, (Reynolds Aff. at 9), and there is no documented response in the record. Ms. Pierce did testify, however, that she orally responded to Mr. Reynolds' request. (Pierce Dep. at 111–14).

On March 6, 2001, Stephen Moss and Linda Pierce met with Mr. Reynolds at a conference room in Dulles Airport to speak with him about his performance. (Moss Dep. at 56). It was decided before the meeting that Mr. Reynolds was going to be placed on a Performance Improvement Plan ("PIP"). (*Id.* at 63). During this meeting, Mr. Reynolds was given information on "what he needed to work on, what he needed to improve, [and] where his skills were lacking." (Pierce Dep. at 136). Additionally, Mr. Reynolds was given the option of resigning with an enhanced severance package or going on the PIP to

save his job. (Moss Dep. at 64).[22] Mr. Reynolds subsequently decided to participate in the PIP. (Reynolds Dep. at 194).

Mr. Reynolds was also given an interim PBC at this time. This interim PBC is dated March 6, 2001, and rates Mr. Reynolds' performance as unsatisfactory. (Reynolds Dep., Ex. 8). The "Overall Assessment" states that:

> Ed's most recent assignment was to provide second chair support on the Air Canada engagement/renegotiation. He attempted to do this but was unable to provide the appropriate level of support and subsequently I had to replace him with another individual as second chair support on the deal. He was not able to generate the required documentation and provide the level of coordination that is required of a second chair and as such his performance at this time is being appraised as unsatisfactory. If he cannot provide solid performance as a "second chair" on a deal of this size, it will be impossible for him to handle deals as a Negotiations Executive.

(*Id.*).

After deciding to participate in the PIP, Mr. Reynolds was assigned to Steven Moss on a negotiation involving Lexmark. (*Id.* at 152–54). Mr. Reynolds testified that he only spent five days with Mr. Moss during the Lexmark project and that Mr. Moss gave him little feedback. (*Id.* at 155–56). Mr. Moss, however, remembers the Lexmark project somewhat differently. During this assignment, according to Mr. Moss, Mr. Reynolds was assigned to prepare a "contract draft based upon the scope of the deal." (Moss Dep. at 86). Mr. Moss testified that:

---

**22.** In addition to the enhanced severance, Mr. Reynolds would have had to sign a release

agreeing not to sue the company. (*Id.* at 64).

The document I got back from Ed, it was timely in its return, but it was a shell document that he took, changed the descriptor in it to accurately reflect the customer's name, but there was no— what's the word I'm looking for? There was no discernible customization to the actual scope of the deal, which is what brings me to the content question of aligning contracts. None of our contracts, the boiler plate contracts that we start with, the templates, are appropriate for any deal because they are just too generic. . . .

There was no customization work done to the project that represented an understanding of the offering . . . .

(*Id.* at 87–89). Mr. Moss states that he went over the contract with Mr. Reynolds, told him what it should say, and then asked Mr. Reynolds to make another effort. (*Id.* at 89). After the second attempt by Mr. Reynolds, however, Mr. Moss testified that "[i]t was still not adequate to be in a position where we could— it was not clearly in a position where it was from a content standpoint prepared and ready to go to a customer, or even close to being ready to go to a customer." (*Id.* at 90). Mr. Moss further testified:

> [I]f I gave him something very specific, it was there. If I did not give him something specific and assumed that he was going to take and develop it throughout the document, it did not follow through. So if I· said, here is an example of something that needs to be done here specifically, that was done. . . .

But, again, the concern, the concern I had which drew the conclusion coming out of this was the fact that says, here is a band ten person, he has been in the business for a significant period of time, and I don't see an understanding of the business here. There is not an independent thought process here.

(*Id.* at 90–91).

At the end of the PIP period, Mr. Reynolds' employment with IBM was terminated. (Reynolds Dep. at 156). Mr. Moss testified that there were two reasons for Mr. Reynolds' termination. The first was that Mr. Reynolds, after eighteen months, did not have a sufficient understanding of the business. (Moss Dep. at 94, 108). The second was the quality of Mr. Reynolds' document work. (*Id.* at 94).

### III. Procedural History

On October 10, 2002, Mr. Reynolds brought a five count complaint against IBM. (Doc. 1). The complaint alleges that IBM violated the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), Section 510 of the Employee Retirement Income Security Act ("ERISA"), and the Florida Civil Rights Act's ("FCRA") age and disability provisions. On February 6, 2004, IBM moved for summary judgment on all of Mr. Reynolds' claims. (Doc. 47). Mr. Reynolds responded to IBM's motion for summary judgment on February 17, 2004. (Doc. 64). IBM, with the Court's permission, filed a reply. (Doc. 83). The Court heard oral argument on the motion on April 2, 2004. (Doc. 82).

### IV. Discussion

#### A. ERISA

■ Section 510 of ERISA provides: It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140. A plaintiff bringing an action pursuant to § 510 of ERISA must show that the employer had the "specific intent to interfere with the employee's right to benefits." *Seaman v. Arvida Realty Sales*, 985 F.2d 543, 546 (11th Cir. 1993). "This standard does not require the plaintiff to show that interference with ERISA rights was the sole reason for discharge but does require plaintiff to show more than the incidental loss of benefits as a result of a discharge." *Id.* "This burden can be met either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by *McDonnell Douglas* ..., and restated in *Burdine* ...." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993). Under this framework, the plaintiff first "must establish a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ "In the context of a § 510 claim alleging unlawful discharge, a plaintiff may establish a prima facie case of discrimination by showing (1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination." *Clark*, 990 F.2d at 1223. While the § 510 plaintiff must show that "the employer's decision was directed at ERISA rights in particular[,]" *Id.* at 1224, the general rule is that "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000); *Kinkead v. Southwestern Bell Tele. Co.*, 49 F.3d 454, 456 (8th Cir. 1995) ("This connection may be based upon circumstantial evidence regarding the employer's intent, such as proof that a discharge fol-

lowed an exercise of protected rights so closely in time as to justify an inference of retaliatory motive.").

■ If the plaintiff successfully establishes the prima facie case, a presumption is created "that the employer unlawfully discriminated against the employee." *Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000).

> If a plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action. However, the employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.... If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.

*Id.*

### 1. Mr. Reynolds' Prima Facie Case

■ The crux of Mr. Reynolds' ERISA claim is that he was placed on the PIP (which led to his discharge ninety days later) shortly after he sent the February 27, 2001 email to Ms. Pierce requesting information about medical leave. The im-

plication Mr. Reynolds wants to draw is that IBM did not decide to convene the March 6 meeting where he was placed on the PIP until after (and in reaction to) his February 27 request for information about medical leave. However, at his deposition, which took place on August 11, 2003, Mr. Reynolds testified that Ms. Pierce called him "two or three weeks before the [March 6] meeting was scheduled, and just said, make your schedule so you can be there on the 6th." (Reynolds Dep. at 152). This testimony is consistent with that of Ms. Pierce, who testified that she had already set up the March 6 meeting when she received Mr. Reynolds' February 27 email. (Pierce Dep. at 120).[23] Thus, Mr. Reynolds' own deposition testimony destroys the causal link between Mr. Reynolds' request for medical leave and IBM's decision to place Mr. Reynolds on the PIP.

On September 3, 2003, however, Mr. Reynolds filed an errata sheet which changed "two to three weeks" to "a little before the meeting," and indicated he could not recall if Ms. Pierce called him "a week or a few days before" the March 6, 2001 meeting. (Doc. 80). Although the Eleventh Circuit has not spoken, the Seventh and Tenth Circuits have dealt with situations where a deponent filed an errata sheet that materially changed original deposition testimony. *See Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000); *Burns v. Board of County Commissioners of Jackson County*, 330 F.3d 1275, 1281–82 (10th Cir. 2003); *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n. 5 (10th Cir. 2002). Both courts analogized the situation to the rule that an affidavit may not be used to contradict a witness's prior sworn testimony. *See Thorn*, 207 F.3d at 389; *Burns*, 330 F.3d at 1281–82. The Tenth Circuit reasoned that Federal Rule of Civil Procedure 30(e), which allows a deponent to file an errata sheet:

> ... cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.

*Burns*, 330 F.3d at 1282; *Garcia*, 299 F.3d at 1242 n. 5 (quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D.La. 1992)).[24] Moreover, the Seventh Circuit concluded "that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Thorn*, 207 F.3d at 389.

Here, Mr. Reynolds does not contend that the portion of his original deposition testimony that he attempts to amend is an error in transcription. Instead, at oral argument Mr. Reynolds claimed that he confused the March 6, 2001 meeting with a meeting he had with Ms. Pierce in January of 2001. However, Mr. Reynolds' deposition testimony reads:

> Q: So, it sounds like, if I understand you correctly, that you were pulled off the Air Canada deal and put onto the Lexmark deal all in the same conversation?
>
> A: I don't know if it's all in the same conversation. *I had been back to the*

---

**23.** Ms. Pierce also testified that she and Mr. Moss were talking as early as December of 2000, and January and February of 2001 about problems with Mr. Reynolds' performance. (Pierce Dep. at 251).

**24.** The Tenth Circuit also stated that "we do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony." *Burns*, 330 F.3d at 1282 (quoting *Garcia*, 299 F.3d at 1242 n. 5).

*Air Canada deal a couple of times after Linda had told me about the meeting in March. I think she called me, I don't know, two or three weeks before the meeting was scheduled, and just said, make your schedule so you can be there on the 6th.* So I went back, I think, a couple of times to—to Montreal, which is where the Air Canada thing was. And then when I got to the meeting in March at Dulles [where Mr. Reynolds was placed on the PIP], I was told that I would be assigned to the Lexmark thing. (Reynolds Dep. at 152) (emphasis added). Mr. Reynolds also gave lengthy testimony about the March 6, 2001 meeting in response to the question that immediately preceded the above quoted question. (*Id.* at 151–52). The *Burns* court was faced with a similar argument involving confusion and concluded:

... although Burns asserts that he was confused at his deposition, his answers to the direct questions posed by counsel do not reflect any obvious confusion-as opposed to indecisiveness-that the corrections would need to clarify. Thus, the district court correctly disregarded Burns's [deposition corrections].

*Burns,* 330 F.3d at 1282. The Court concludes that Mr. Reynolds' answers in his deposition do not reflect any obvious confusion that would justify the material alterations the errata sheet attempts to make to his original testimony. The amendments to Mr. Reynolds' testimony will therefore be disregarded.

Mr. Reynolds' testimony that he knew about the March 6, 2001 meeting two to three weeks beforehand undermines any causal relationship between the February 27, 2001 email and Mr. Reynolds' placement on the PIP. Mr. Reynolds has therefore failed to establish a prima facie case under § 510 of ERISA because he cannot show he was placed on the PIP under circumstances giving rise to an inference of discrimination.

2. IBM's Nondiscriminatory Reason

■ Assuming, *arguendo,* that Mr. Reynolds could prove a prima facie case under § 510 of ERISA, IBM has proffered a nondiscriminatory reason for placing Mr. Reynolds on the PIP and terminating him. IBM claims that Mr. Reynolds knew he had to develop in certain areas and failed to do so. (Doc. 47 at 22). Following Mr. Reynolds' performance on the Air Canada deal and during the PIP period, IBM asserts that the determination was made that Mr. Reynolds had not performed in a satisfactory manner and should be terminated.

3. Pretext

Mr. Reynolds argues that IBM's description of his performance as poor conflicts with the record and is evidence of IBM's "pervasive mendaciousness." [25] Mr. Reynolds points to his 1999 and 2000 PBCs, both of which indicate that he was performing at a satisfactory level. Further, Mr. Reynolds relies upon the New Hire Assessment form that was included with the 1999 PBC and should have been included in the 2000 PBC. These New Hire Assessment forms show [26] that Mr. Reyn-

---

**25.** Mr. Reynolds argues that it is an "item of mendacity" that IBM asserts that "the Dulles meeting of Tuesday, March 6, 2001 ... was scheduled *before* Pierce received Plaintiff's email message of February 27, 2001, asking about medical leave." (Doc. 64 at 21). Mr. Reynolds continues on to state that "[b]y this falsehood, IBM wishes to defeat the causal link between Mr. Reynolds' email dated Feb-

ruary 27, 2001 and his *ad hoc* PBC assessment, and unsatisfactory overall rating, one week later." (*Id.*). However, as discussed above, Mr. Reynolds' deposition testimony confirms IBM's claim that the March 6, 2001 meeting was scheduled before February 27, 2001.

**26.** *See* note 18, *supra.*

olds' skills met or exceeded IBM's expectations.

However, between Mr. Reynolds' 2000 PBC[27] and his placement on the PIP in March of 2001, Mr. Reynolds served as a second chair to Tom Kramer on the Air Canada project. Mr. Kramer testified that during the Air Canada deal Mr. Reynolds could not complete the duties of a second chair in a satisfactory manner. (*Id.* at 58–64). Mr. Kramer also gave extensive testimony as to Mr. Reynolds' inability to manage documents, lack of PC skills, and inability to understand the complexities of the deal. (*Id.* at 82–102).[28] Mr. Reynolds himself testified that he had trouble with pulling together documents and document preparation during the Air Canada negotiation. (Reynolds Dep. at 149). The interim PBC that Mr. Reynolds was provided in March of 2001 based Mr. Reynolds' unsatisfactory rating solely on his performance on the Air Canada deal.

Mr. Reynolds' response to Mr. Kramer's testimony is that he only worked for Mr. Kramer for a few weeks and that, during the first week or so, Mr. Reynolds' laptop was not operating properly. Mr. Kramer testified, however, that even after Mr. Reynolds' laptop was no longer failing, Mr. Reynolds could not manage documents sufficiently to meet Mr. Kramer's needs. (*Id.* at 58–60). Moreover, Mr. Reynolds does not claim that the failure of his laptop had any impact on his inability to understand the complexities of the deal, an area

which Mr. Kramer viewed as a "fatal flaw" that would keep him from working on similar types of projects. (*Id.* at 60–61).

Mr. Reynolds also claims that "[t]here is a reasonable inference to be drawn from this latest dishonest effort by IBM to falsely describe the essential requirements of Mr. Reynolds' job: IBM knows that Mr. Reynolds came to IBM from outside the IT industry and is therefore attempting to use that as justification for his termination." (Doc. 64 at 20). Mr. Reynolds points to Ms. Doyle's[29] deposition where she testified as follows:

> Q: Was a thorough understanding of the IT industry necessary for the job you were hiring?
>
> A: No, it was not.

(Doyle Dep. at 37). Ms. Doyle also testified, however, that the expectations of the position were "that [Mr. Reynolds] would be able to negotiate a deal of considerable size pretty much on his own. And having, you know, a good enough understanding of IBM, and all of its intricacies, and all of its towers, and all of its, you know, parts of a contract, so that he could articulate." (*Id.* at 24).

More problematic for Mr. Reynolds is his own deposition testimony:

> Q: Well, the question has to do with—and I'll show you what I'm looking at, is Paragraph 33 of the complaint, it says: Mr. Reynolds was assured by IBM management that the word processing skills

---

**27.** While a score of "3" on a PBC indicates that the person has "Achieved some/most commitments," Mr. Reynolds' 2000 PBC specifically noted that he had only met "some of his PBC commitments for 2000." (Reynolds 2000 PBC at 5).

**28.** In an attempt to demonstrate pretext, Mr. Reynolds' response to the motion for summary judgment argues that IBM's explanations for his termination are actually evidence of its "mendacity" and "dissembling." However, as noted *supra*, Mr. Kramer no longer

worked for IBM at the time of his deposition. While the Court recognizes that credibility determinations should not be made at the summary judgment stage, the fact that Mr. Kramer's testimony was given at a time when he no longer was employed by IBM undermines Mr. Reynolds' claim that IBM's explanation for his termination is a result of "dissembling" or its "mendacity."

**29.** Ms. Doyle interviewed Mr. Reynolds and suggested that he be hired.

were not required and that IT skills would be learned along the way.

And so, the question has to do with, did the—were you told during your interview process that you would learn information technology skills along the way?

A: What I was told at the interview process was that the level of understanding of the information technology skills, as you call them, would occur during the negotiations process. They were not looking for in-depth technology expertise or IT expertise. They were looking for a general view of it...

Q: You did understand in the interview process that you would have to learn information technology skills along the way?

A: I understood I would learn additional information relative to information technology along the way, correct.

Q: And so you had that expectation as part of the interview process?

A: I was told that in the interview.

(Reynolds Dep. at 240–41). Mr. Reynolds' deposition testimony is confirmed by his IDP, which he filled out in late 1999 or early 2000. (Reynolds Dep. at 242–43). In his IDP, Mr. Reynolds indicated that he needed to "[i]ncrease [his] knowledge of IBM offerings and solutions in the Information Technology area. An overall increase in [ ] my knowledge level as it relates specifically to the Information Technology industry." (Doc. 47, Ex. A). Indeed, Mr. Reynolds ranked himself as having "limited knowledge" in that area at the time he filled out the IDP. (*Id.*). Fi-

nally, Mr. Reynolds' 1999 and 2000 PBCs indicated that he needed to increase his knowledge of IBM's processes and product offerings.

Therefore, Mr. Reynolds knew at the interview stage, as well as early on in his employment with IBM, that he would have to increase his general knowledge of the IT industry and IBM's product offerings. Thus, IBM's claim that Mr. Reynolds had insufficient knowledge of its products is not evidence of its "mendacity," as Mr. Reynolds suggests.

Also included as part of IBM's nondiscriminatory reason for terminating Mr. Reynolds was his inability to produce contract documents in a satisfactory manner. (Reynolds Dep., Ex. 8). The IDP that Mr. Reynolds completed in late 1999 or early 2000 states that he needed to increase his "facility with computer and document producing tools . . . ." (Doc. 47, Ex. A). Thus, early in his employment at IBM Mr. Reynolds knew that he needed to be able to produce documents at a satisfactory level. (*See* Reynolds Dep. at 228–36). Additionally, Mr. Reynolds testified that he received negative oral feedback from Ms. Donohue about his ability to produce documents. (*Id.* at 137–39). Moreover, Mr. Kramer testified that Mr. Reynolds could not fulfill his document production duties while working on the Air Canada project. (Kramer Dep. 57–64).[30] Finally, Mr. Moss testified that there was no improvement in Mr. Reynolds' document production during the Lexmark project. (Moss Dep. at 80–91).[31]

---

**30.** Although Mr. Reynolds' computer was not functioning properly when he first began on the Air Canada project, Mr. Kramer testified that even after Mr. Reynolds' computer was fixed he still could not provide the level of document production necessary to successfully perform as a second chair. (Kramer Dep. at 59).

**31.** Mr. Reynolds relies upon Ms. Doyle's testimony at several different places in his re-

sponse. One part of Ms. Doyle's testimony that Mr. Reynolds did not point out, however, is her statement that "the expectation at any level at our organization was you needed to be able to type, whether you typed with two fingers or the normal way with 10 didn't [ ] make a difference to us." (Doyle Dep. at 38). *See also* Donohue Dep. at 87–92 (Ms. Donohue testified that although she "can't type

Mr. Reynolds offers no evidence that he produced documents at an acceptable level while he was at IBM. Instead, Mr. Reynolds claims that he was told that word processing skills were not required. However, the evidence in the record shows that Mr. Reynolds knew early in his tenure at IBM that he would have to produce contract documents. Mr. Reynolds has not produced sufficient evidence to question this aspect of IBM's nondiscriminatory reason for his termination. Summary judgment on Mr. Reynolds' ERISA claim is therefore due to be granted, as Mr. Reynolds has not created a genuine issue of material fact that IBM's reasons for his termination are pretextual.[32]

### B. ADA

Based on his osteoarthritis in his knee, Mr. Reynolds brings an ADA claim. "The ADA provides that employers shall not discriminate against qualified individuals with a disability because of the disability." *Wood v. Green,* 323 F.3d 1309, 1312 (11th Cir. 2003) (citing 42 U.S.C. § 12112(a)). "In order to establish a prima facie case of discrimination under the ADA, the plaintiff must show that: (1) he is disabled; (2) he was a 'qualified individual' at the relevant time; and (3) he was discriminated against because of his disability." *Id.* (quoting *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001)). "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability." *Lucas,* 257 F.3d at 1255 (citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)). "A leave of absence and leave extensions are reasonable accommodations in some circumstances." *Criado v. IBM Corp.,* 145 F.3d 437, 443 (1st Cir. 1998).

■■ IBM attacks several aspects of Mr. Reynolds' prima facie case, including whether he was a "qualified individual." A "qualified individual with a disability" is "an individual with a disability who, with

---

without looking," she had to produce documents when she was a second chair).

**32.** In addition to the February 27, 2001 email, Mr. Reynolds also sent an email regarding medical leave to Linda Pierce on June 26, 2000, which stated:

> Linda,
> You are probably aware of the fact that I have been suffering with a severe knee problem over the last several months with a number of other health problems which have resulted from the knee problem.... Relatively modest activities such as walking can cause considerable pain.... I had surgery in Jan. 2000 to remove a torn piece of meniscus but this procedure did not help the existing problem. I am working with several physicians at the Mayo Clinic in Jacksonville who have indicated that the appropriate therapy for me will probably involve joint replacement either complete or partial. There are a few other options that I will pursue prior to replacement.
> I will continue to work on assignments when I am able to do so. I will travel when I am able, but during the next several months (I do not really know the period of time that will be required for the problem to be corrected) travel may be difficult or impossible.
> *I am not familiar with the HR systems and procedures. Is there such a thing a medical leave? temporary disability, etc? Something that would provide me the necessary time to have the medical problem addressed.*
> Please give me a call to discuss.
> Ed Reynolds.

(Pierce Dep., Ex. 2) (emphasis added). Although Mr. Reynolds claims that Ms. Pierce did not respond to his request for information about medical leave, there is no evidence that Mr. Reynolds was treated any differently after he made this initial request for information. This email undermines any inference that can be drawn that IBM fired Mr. Reynolds with the specific intent of denying him ERISA benefits. If denial of ERISA benefits was the motivating factor in IBM's decision, then it is reasonable to believe that the June 26, 2000 email would have elicited an adverse employment action from IBM.

or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Davis v. Fla. Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir. 2000) (quoting 42 U.S.C. § 12111(8)). Thus, Mr. Reynolds must show "either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." *Id.* The essential functions of a job are determined on a case-by-case basis. *Id.* "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this descriptor shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The regulations also set a non-exhaustive list of factors a court may consider when considering whether a particular function is essential:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

. . .

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).[33]

Mr. Reynolds argues that the job description provided to him before he took the position did not require any information technology experience or document production. While this is a factor which indicates that these two aspects of the job may not be essential functions, there is uncontradicted evidence that Mr. Reynolds knew, as early as the interview process, that he would need to "learn additional information relative to information technology along the way." (Reynolds Dep. at 240–41). Mr. Reynolds also became aware of the amount of document production required by the position while he observed the Ace deal shortly after he started.[34] Moreover, Mr. Reynolds' IDP, which he filled out in either late 1999 or early 2000, demonstrates that he knew he needed to improve his "[f]acility with computer and document processing tools" and "[i]ncrease [his] knowledge of IBM offerings and solutions in the Information Technology area." (Doc. 47, Ex. A). This IDP was completed after input from Mr. Reynolds' managers as to what skills he needed to improve, which occurred in late 1999 or the first 30 days of 2000. (Reynolds Dep. at 243–44). Thus, Mr. Reynolds knew early on in his employment with IBM that he was going to have to produce documents and increase his knowledge of IBM's product offerings in the IT industry.

Ms. Donohue also testified that despite the fact that she could not type "without looking," she still had to produce documents herself. (Donohue Dep. at 86–87). Mr. Kramer testified that the duties of a second chair included "to maintain document control internally, distribute documents, receive comments, consolidate comments, prepare documents, track action items, close action items, follow people, get the people into a meeting, make copies of

---

**33.** The analysis for disability claims under the FCRA is the same as the ADA. *McCaw Cellular Communications of Fla., Inc. v. Kwiatek,* 763 So.2d 1063, 1065 (Fla. 4th DCA 1999).

**34.** Both Mr. Reynolds' interview and observation of the Ace deal occurred before Mr. Reynolds was diagnosed with osteoarthritis.

documents, coordinate, basically coordinate the overall deal from a negotiation standpoint for me." (Kramer Dep. at 47). Mr. Kramer also gave extensive testimony as to Mr. Reynolds' inability to manage documents. (*Id.* at 58–64).

Mr. Reynolds also was given feedback in both of these areas during his time at IBM. Both his 1999 and 2000 PBC indicate that he needed to improve his knowledge of IBM's product offerings. Mr. Kramer also testified that Mr. Reynolds could not understand the complexities of the Air Canada deal. Moreover, while not specifically mentioned in either the 1999 or 2000 PBC, Mr. Reynolds testified that he received negative feedback about his ability to produce documents from Ms. Donohue during the Aventis deal. Mr. Kramer also testified that Mr. Reynolds could not produce documents at a satisfactory level during the Air Canada project. Mr. Reynolds admitted that he had problems with managing documents on that project. (Reynolds Dep. at 149). Additionally, Mr. Reynolds' performance did not improve while he was on the PIP. (Moss Dep. at 80–91). There is also ample evidence in the record that indicates that other employees in Mr. Reynolds' position were expected to produce contract documents. Notably, Mr. Reynolds does not contend he could produce documents in a satisfactory manner, but only that it was not a requirement of the position. However, the record conclusively shows otherwise.

Mr. Reynolds, therefore, is not a "qualified individual" under the ADA because he cannot show that, at the time he was discharged, he was able to perform one of the essential functions of his position with or without reasonable accommodation. *See Pouncy v. Vulcan Materials Co.,* 920 F.Supp. 1566, 1582 (N.D.Ala.1996) (An employee is not a qualified individual under the ADA if he was not performing his job "at a level that met [his] employer's legiti-

mate expectations at the time of [his] discharge."). IBM's motion for summary judgment on Mr. Reynolds' ADA claim is therefore due to be granted.

██ Alternatively, the Court concludes that Mr. Reynolds cannot establish that he was discriminated against because of his alleged disability. Mr. Reynolds' testimony concerning when the March 6, 2001 meeting was scheduled which was discussed with respect to his ERISA claim, (*See* pp. 1299–1301, *supra*), is also relevant to his ADA claim. Thus, even if Mr. Reynolds' February 27, 2001 email constitutes a request for accommodation-an issue the parties have not raised and about which the Court expresses no opinion-Mr. Reynolds' own testimony undermines any inference that he was placed on the PIP because of a request for accommodation. Moreover, Mr. Reynolds' alleged disability had nothing to do with his ability to perform his job. Mr. Reynolds testified that although he had trouble getting through airports, he was always able to travel as requested by IBM. Nor is there any connection between Mr. Reynolds' knee trouble and his inability to produce contract documents or his lack of sufficient knowledge of IBM's products. Thus, there is no evidence that Mr. Reynolds was discriminated against because of his alleged disability.

### C. ADEA

The ADEA provides that it is "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The *McDonnell Douglas* framework also applies to ADEA cases. *Chapman,* 229 F.3d at 1024. To establish a prima facie case under the ADEA the plaintiff must show that he "(1) was a

member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual." *Id.*

Assuming, *arguendo,* that Mr. Reynolds can establish a prima facie case under the ADEA, his claim fails for the same reasons as his ERISA claim: he has not proffered sufficient evidence that IBM's nondiscriminatory reasons for terminating him are pretextual. The only evidence that Mr. Reynolds has presented that has anything to do with age is that "some of the individuals would say, let's sit here and wait for the old man, Ed, and his leg to get up." (Reynolds Dep. at 204–05). As to who made these comments, Mr. Reynolds testified "Well, Tom Kramer is one individual. I think Sheila Donohue might've mentioned it one time, or a couple of times, in that fashion, in Pennsylvania at the Aventis thing." (*Id.* at 205). These alleged comments, which Mr. Kramer and Ms. Donohue deny making, are stray remarks and are not probative of the state of mind of IBM at the time of Mr. Reynolds' termination. *Steger v. Gen. Elec. Co.,* 318 F.3d 1066, 1079 (11th Cir. 2003) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J. concurring)) ("statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process at issue will not satisfy the employee's burden.") (quotations omitted). Here, the alleged "old man" comments are not sufficiently linked to the decisional process to create an issue of fact concerning pretext. Moreover, Mr. Reynolds was 54 years old when he was hired by IBM and was 56 when he was terminated. *See Hennessey v. Good Earth Tools, Inc.,* 126 F.3d 1107, 1109 (8th Cir. 1997)

(Employer's hiring of employee at 55, "when he was well within the age group protected by the ADEA, suggests that [the employer] was not influenced by ageism in firing him four years later"). The Court therefore concludes that Mr. Reynolds has not come forward with sufficient evidence of pretext, and that IBM's motion for summary judgment on Mr. Reynolds' ADEA claim is due to be granted.[35]

Accordingly, it is hereby

**ORDERED:**

1. Defendant International Business Machines Corporation's Motion for Summary Judgment (Doc. 47) is **GRANTED**.

2. The Clerk shall enter judgment in favor of defendant International Business Machines Corporation and against plaintiff Edwin Reynolds upon the filing of a certificate by IBM that it has paid the sanctions as ordered by the Court in its April 8, 2004 Order (Doc. 81).

3. Thereafter, the Clerk shall term any pending motions and close the case.

---

**35.** The analysis for age based claims under the FCRA is the same as the ADEA. *Carroll v. Neumann,* 204 F.Supp.2d 1344, 1352 n. 1

(S.D.Fla.2002) (citing *Florida State Univ. v. Sondel,* 685 So.2d 923, 925 n. 1 (Fla. 1st DCA 1996)).